# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

TONYA L. M.,[1]

        Plaintiff,

v.                              ACTION NO. 2:21cv667

KILOLO KIJAKAZI,
        Commissioner of Social Security,

        Defendant.

## UNITED STATE MAGISTRATE JUDGE'S
## REPORT AND RECOMMENDATION

Tonya M. ("plaintiff") brought this action, pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3),

seeking judicial review of a decision of the Commissioner ("Commissioner") of the Social Security

Administration ("SSA") denying her claims for benefits under Title II of the Social Security Act.

An order of reference assigned this matter to the undersigned. ECF No. 11. Pursuant to

the provisions of 28 U.S.C. § 636(b)(1)(B), Rule 72(b) of the Federal Rules of Civil Procedure,

and Local Civil Rule 72, it is recommended that plaintiff's motion for summary judgment (ECF

No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be

**GRANTED**.

---

[1] In accordance with a committee recommendation of the Judicial Conference, plaintiff's last name has been redacted for privacy reasons. Comm. on Ct. Admin. & Case Mgmt. Jud. Conf. U.S., Privacy Concern Regarding Social Security and Immigration Opinions 3 (2018).

# I.   PROCEDURAL BACKGROUND

Plaintiff applied for disability insurance benefits on February 26, 2020, alleging disability beginning January 1, 2019, due to depression, anxiety, bipolar disorder, and other mental health issues.[2]  R. 55, 156–59, 199.  Plaintiff's date last insured for purposes of disability insurance benefits is December 31, 2024.  R. 55.

After denial of her benefits claim both initially and on reconsideration, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  R. 55–61, 63–74.  ALJ Michelle Wolfe heard the matter on July 8, 2021, and issued a decision denying benefits on July 30, 2021.  R. 12–30, 35–52.  On October 21, 2021, the Appeals Council denied plaintiff's request for review of the ALJ's decision.  R. 1–5.  Therefore, the ALJ's decision stands as the final decision of the Commissioner for purposes of judicial review.  *See* 42 U.S.C. §§ 405(h), 1383(c)(3); 20 C.F.R. § 404.981.

Having exhausted administrative remedies, plaintiff filed a complaint on December 22, 2021.  ECF No. 1.  The Commissioner answered on March 25, 2022.  ECF No. 9.  The parties filed motions for summary judgment, with supporting memoranda, on May 2 and June 1, 2022, respectively.  ECF Nos. 13–16.  Plaintiff filed a reply brief on June 22, 2022.  ECF No. 17.  As no special circumstances exist that require oral argument, the case is deemed submitted for a decision.

# II.   RELEVANT FACTUAL BACKGROUND

Plaintiff presents two issues on appeal.  First, she argues that the ALJ erroneously discounted the opinions of plaintiff's licensed clinical social worker (Anne Abraham) by failing to properly evaluate her opinions for supportability and consistency and by relying upon invalid

---

[2] Page citations are to the administrative record that the Commissioner previously filed with the Court.

reasons for rejecting such opinions. Pl.'s Mem. of Law in Supp. of Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 14, at 9–12. Second, plaintiff argues that the ALJ erred at step three in finding that plaintiff's mental health conditions and the evidence failed to meet the severity required by the applicable listings. Pl.'s Mem. 12–16. Specifically, plaintiff argues that the evidence establishes that she satisfied the C criteria that would support a finding of disability at step three and that the ALJ concluded otherwise without analysis of the evidence. *Id.* The Court's review of the facts below is tailored to such arguments.

## A.   *Background Information and Hearing Testimony by Plaintiff*

Plaintiff testified remotely before ALJ Wolfe on July 8, 2021. R. 37–47. At that time, she was 50 years old and living with her daughter (age 19) and two sons (ages 20 and 32), one of whom is disabled. R. 41–42. Plaintiff is a college graduate. R. 41.

Plaintiff testified to previously receiving disability benefits from the SSA, which began in 2003 and recently stopped after her participation in an SSA back-to-work program beginning in 2018. R. 44–46. Plaintiff worked for QVC as a part-time, customer service representative through February 2020. R. 41–42, 44–46; *see* R. 184 (noting work from QVC from 2007 to 2020), 200, 216. Although she had "problems" with "anxiety and . . . shaking" and was unable to work all hours requested, plaintiff worked for a period of time because QVC allowed her to take off "whenever [she] didn't feel good." R. 45–46 (noting, for example, that she went out on short-term disability in October 2019), 217, 221. After briefly returning to work in February 2020, however, plaintiff stopped working due to anxiety, shaking, problems with focus, concentration, and talking with others, social anxiety, and medication-induced drowsiness and lightheadedness. R. 41, 46; *see* R. 44 (describing vertigo).

Plaintiff receives mental health treatment every two to four weeks through the Norfolk Community Services Board ("NCSB") and Hampton Roads Behavioral Health. R. 42. From Spring 2021 through the hearing date, plaintiff reported being unable to do chores, including cooking, cleaning, and shopping, due to a lack of desire and will to get up. R. 43.

Plaintiff submitted a detailed function report to the SSA on April 20, 2020. R. 224–31. Plaintiff described herself as severely depressed, unpredictable due to bipolar disorder, overwhelmed with anxiety, and suffering from "constant" panic attacks. R. 224. Before her illness, plaintiff liked to go for walks and to the movies, read books, cook meals for her family, and could perform household chores. R. 225–26, 228. Due to her condition, however, plaintiff reports that: (1) she mostly stays home, remains in her bedroom, and sleeps much of the day, as she cries, worries, and has panic attacks when awake; (2) she goes days without dressing and bathing, months without washing her hair, and no longer shaves; (3) depression limits her appetite, but she eats when food is brought to her; (4) she has daily phone calls with her mother, but otherwise does not socialize due to anxiety, discomfort in crowds, a lack of friends, and a lack of trust in and fear of others; and (5) due to fatigue and a lack of interest, she gave up most hobbies, does not clean or do laundry, and only infrequently cooks. R. 225–29.

Plaintiff continues to care for her grown children. R. 225. Although she is nervous and limits trips outside the house, plaintiff continues to drive, including to take her children to doctor's appointments, run errands, make trips to the grocery store, and attend her own medical appointments. R. 225, 227 (describing sending her children into the store with grocery lists, while she waits in the car). When necessary, plaintiff cooks two to three times per week, usually by preparing frozen meals, soup, and/or salad. R. 226. Plaintiff's only remaining hobby is watching TV, which is impacted by her inability to focus. R. 228. Plaintiff remains able to handle family

financial matters, but worries about a lack of money and has had problems paying bills on time. R. 225, 227–28.

Plaintiff's condition affects her ability to talk, concentrate, remember, understand, follow instructions, and get along with others. R. 229 (noting she can follow written or spoken instructions only 50% of the time and had problems remembering why customers called for assistance). Plaintiff estimates that she can walk five minutes before stopping to rest, can pay attention for only two to three minutes, and has problems finishing tasks. *Id.* Finally, plaintiff says that she interacts poorly with authority figures, including bosses, and has problems dealing with stress and changes in routine. R. 230.

**B.** **_Hearing Testimony by Vocational Expert_**

Patricia Chilleri, a vocational expert ("VE"), also testified at the hearing. R. 47–51, 269–73. She identified plaintiff's past relevant work as an order service representative. R. 48. The ALJ presented VE Chilleri with several hypotheticals premised on a person of plaintiff's age, education, work history, and RFC for work at all exertional levels. *Id.* In response to the ALJ's first hypothetical, the VE opined that an individual, limited to simple, routine (non-complex) tasks, a low-stress work environment (with occasional changes in the workplace setting and decision-making), with occasional interaction with the public and co-workers and frequent supervisory interaction, could not return to plaintiff's past relevant work. *Id.* The VE next opined, however, that such an individual could perform unskilled work, including as an inserter (filling, packing, and wrapping worker), as a semiconductor bonder (metal and plastics worker), and as a marker ticketer (stock clerk). R. 48–49. Such jobs exist in significant numbers in the national economy. R. 49. The VE also testified that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), except as otherwise based on her own experience and observations. R. 51.

5

In a second hypothetical, the ALJ added more limitations, including no interaction with the public and only occasional interaction with supervisors and co-workers, but no "team-type" work setting. R. 49. In a third hypothetical, the ALJ also added a limitation for "no fast[-]pace[d] production work such as conveyor belt work or quota-base work." *Id.* The VE opined that none of these additional limitations affected performance of the jobs noted above. R. 49–50. If, however, the hypothetical person were to be off-task 15% of the time and be "unable to complete the jobs," the VE opined that such limitations "would preclude all competitive employment." R. 50.

In response to a question from plaintiff's counsel, the VE opined that consistently missing two days per month would lead to job termination and preclude employment. *Id.*

## C.   *Relevant Medical Record*

### 1.   *Treatment with Roosevelt Family Medicine/Bayview Physicians Group*

Plaintiff received primary medical care dating back to May 6, 2016 from Roosevelt Family Medicine ("RFM"). R. 504–05. After nearly a year since her last visit, on January 23, 2019, plaintiff treated as a "[n]ew [p]atient" at RFM to re-establish care and seek help for migraines and a runny nose. R. 471–73. A patient history and other notes reflect, among other things, a medical history of depression ("[m]anic [d]epressive, [o]ther" treated by Dr. Schwartzer, psychiatrist), panic disorder, and bipolar disorder, and identified her current medications for those and other conditions, as well as a new prescription (Imitrex) to treat migraine headaches. R. 471, 473. A review of systems noted, among other things, "no anxiousness, no depression, no stress, no confusion, no memory loss, [and] no insomnia," and a physical exam found plaintiff to be alert and fully oriented, with her memory intact, and with appropriate mood, affect, judgment, and insight. R. 474–75.

6

At a six-month follow-up exam on July 24, 2019, plaintiff complained of gastro-intestinal problems and when asked why she failed to "get [her] labs done" as ordered during her last visit, plaintiff responded that she "can never fast." R. 466; *see also* R. 469 (re-ordering all labs, except cholesterol due to non-fasting). A review of systems and physical exam again noted "no anxiousness, no depression, no stress, no confusion, no memory loss, [and] no insomnia," and found plaintiff to be alert and fully oriented, with her memory intact, and with appropriate mood, affect, judgment, and insight. R. 468–69.

Plaintiff returned to RFM on October 23, 2019, and sought treatment for mental health issues. R. 462–65. A review of systems found her to be positive for depression, but without complaints of anxiousness, stress, confusion, memory loss, insomnia, changes in appetite, fatigue, or malaise. R. 464. A physical exam again found plaintiff to be alert and fully oriented, with her memory intact, and with appropriate mood, affect, judgment, and insight. R. 465. During treatment, plaintiff reported being unhappy at work and, after working at home for the last six weeks, having been fired for taking too many days off. R. 463. Plaintiff reported also treating with a psychiatrist and a counselor and advised that, after substituting alcohol for her mental health medications to try and cope with symptoms, she recently returned to taking Wellbutrin, Zoloft, and Klonopin. *Id.*

During a November 25, 2019, follow-up exam, plaintiff reported that she was "doing well for now" with increased counseling, as well as a psychiatrist's note for medical leave through December 2019. R. 457. Plaintiff also stated, however, that working 20 hours per week at a call center "depressed and stressed" her. *Id.* The results from a review of systems and a physical exam were the same as on plaintiff's prior visit, except she was no longer deemed positive for depression. R. 459–60.

When next seen at RFM on August 21, 2020, plaintiff reported "feeling panicky/anxious – [as] her disability coverage was cut off" and complained of diarrhea and nausea when nervous, and of palpitations due to anxiety. R. 453. Although noting plaintiff's history of illness, a review of systems was "otherwise negative" and a physical exam revealed plaintiff to be in no acute distress, fully alert and oriented, and with a normal affect and mood. R. 455. The nurse practitioner directed plaintiff to follow-up with her psychiatrist. R. 456.

### 2. Treatment with Dr. Joseph Schwartzer, M.D., and Anne Abraham, L.C.S.W.

Plaintiff has an extensive history of treatment with Dr. Schwartzer, her psychiatrist, and with Anne Abraham, a licensed clinical social worker ("LCSW"), both before, R. 319–28 (in 2018), 348–423 (from 2012 through 2018), and after the alleged onset of disability date of January 1, 2019, R. 313–18, 335–46, 424–46, 541–56, 559–71, 574–604.[3]

### a. Psychotherapy and Medication Management in 2019

Plaintiff saw LCSW Abraham for approximately 12 psychotherapy visits from April to December 2019, usually every two to three weeks. R. 313–18, 335–40. LCSW Abraham diagnosed plaintiff as having an anxiety disorder, bipolar disorder, and depression, major, recurrent, moderate, see, e.g., R. 318, and a primary diagnosis of bipolar disorder, current episode depressed, severe, without psychotic features, see, e.g., R. 335, with a later secondary diagnosis of generalized anxiety disorder in late 2019, see, e.g., R. 340.

LCSW Abraham's mental status exams of plaintiff in 2019 found her to be fully oriented,

---

[3] Dr. Schwartzer provided services through the NCSB. See, e.g., R. 354. In 2014, plaintiff twice received services from another licensed clinical social worker at the NCSB. R. 349–50, 352. LCSW Abraham originally provided services while affiliated with Lafayette Psychiatric Services, see, e.g., R. 328–29, and later through Hampton Roads Behavioral Health, P.C., see, e.g., R. 336. Lewis Taylor, Ph.D., of Hampton Roads Behavioral Health also treated plaintiff on one occasion on August 22, 2019. R. 335.

with normal speech, mood, affect, thoughts, perceptions, judgment, and insight, without evidence of hallucinations, delusions, cognitive impairment, or suicidal ideation or intent.  R. 313–18. Treatment notes recounting the history of plaintiff's illness, however, also identify numerous symptoms associated with bipolar disorder, anxiety, and depression, with exacerbations due to emotional, family, workplace, and financial stressors.  *Id.*  They also recite that plaintiff described her bipolar disorder as moderate and unchanged, her anxiety as severe and unchanged, and her depression as severe and unchanged.  *Id.*  The notes also reflect prescriptions for "atypical antipsychotics," mood stabilizers, benzodiazepines, selective serotonin reuptake inhibitors, antidepressants, and mood stabilizers, along with psychotherapeutic counselling.  *Id.*  Each of the treatment notes also repeats that plaintiff can perform activities of daily living, housework, and work, with unspecified limitations, and can engage in limited social functioning.  *Id.*

Dr. Schwartzer saw plaintiff for three medication management visits from April through November 2019.  R. 424–32.  His diagnoses included bipolar II disorder, persistent depressive disorder, generalized anxiety disorder, and personality disorder not otherwise specified with borderline features.  *See, e.g.*, R. 426.  His mental status exams in 2019 describe plaintiff as:  (1) alert; (2) having a steady gait and station; (3) having organized thoughts and no loose associations or flight of ideas; (4) presenting with relevant, coherent, and goal-directed speech; (5) reporting poor memory and concentration, but exhibiting a grossly intact recent and remote memory; (6) being fully oriented, with a clear sensorium, and intact cognitive functioning; (6) having fair insight and judgment; (7) having a mildly depressed mood (except for when moderately depressed on November 1, 2019) and a mildly anxious affect; (8) being appropriately dressed and groomed, with fair eye contact; and (9) not appearing as manic, psychotic, suicidal, homicidal, shaky, drowsy, or intoxicated.  R. 425, 428, 431.

9

On April 1, 2019, plaintiff reported "feeling more down today, and lately, than" ever before. R. 318. She complained of gaining weight and lacking motivation, including for cooking. *Id.* Plaintiff declined pursuit of inpatient treatment, stating she wanted to wait until after her son's impending high school graduation. *Id.*

On April 24, 2019, plaintiff saw Dr. Schwartzer for medication management and noted feelings of depression at the prospect of children leaving home for college. R. 424–25. She reported keeping busy with babysitting a four-year-old granddaughter. R. 424. Plaintiff wanted to continue working at QVC, but had been calling in sick, for mental health reasons. *Id.* She reported poor weekly medication compliance and said she substituted a bottle of wine when depressed. *Id.* Plaintiff also had difficulty sleeping without medication and experienced, among other things, nightmares, crying, irritability, headaches, anxiety (without panic attacks), and depression. *Id.* Plaintiff also reported having financial problems and isolating herself, except from immediate family. *Id.* Dr. Schwartzer assessed her bipolar disorder as remaining mild with medication, and her depression as worse. R. 425. He adjusted her Zoloft and Wellbutrin prescriptions to help improve her compliance. *Id.*

On May 9, 2019, plaintiff told LCSW Abraham about worsening depression and distress due to the SSA's impending termination of disability payments, reportedly for exceeding earnings limits for several months. R. 317.

On May 24, 2019, plaintiff told LCSW Abraham that she remained depressed, had confined herself to her house or bedroom, and that her status had not improved with the recent changes in medication. R. 316. Plaintiff desired to think over her therapist's recommendation for in-patient treatment, due to concern about leaving her teenage children alone. *Id.*

During treatment with LCSW Abraham on June 4 and 18, 2019, plaintiff expressed concern about losing her job at QVC and also reported difficulties with her recent mother's visit, apparently for her son's high school graduation. R. 314–15. Following her mother's departure, plaintiff planned to vacation with her two children in Ocean City, MD. R. 314.

On June 19, 2019, plaintiff met with Dr. Schwartzer and voiced concern about losing disability benefits, and complained of increasing depression, anxiety, and problems sleeping. R. 427. Due to an inability to work full-time due to her mental health issues, plaintiff worried about becoming homeless again. *Id.* Nevertheless, plaintiff continued to babysit her granddaughter and to work part-time at QVC. *Id.* Plaintiff reported drinking less often and taking her medications as prescribed (except for a sleep aid on nights before work). *Id.* Dr. Schwartzer noted positive results from increasing plaintiff's Zoloft dosage, but that she experienced mild bipolar disorder even when medicated. R. 428.

On July 12, 2019, plaintiff stated to LCSW Abraham that she wanted to quit working due to reduced flexibility and the therapist encouraged pursuit of other part-time work. R. 313. Plaintiff advised that her financial difficulties had recently lessened due to receipt of unexpected money and the employment of her youngest children. *Id.*.

On August 22, 2019, plaintiff received therapy from Lewis Taylor, Ph.D., who described her as benefitting from therapy, and working on managing anxiety and coping and adapting to life stressors. R. 335. Although unhappy at work and afraid of being fired, plaintiff reported successfully vacationing with children in Myrtle Beach, and also stopping to visit her mother. *Id.*

During therapy on September 16 and October 10, 2019, plaintiff described being overwhelmed with transitioning to work at home and with disruptions caused by her 23-year-old's return to the home, and expressed worry about being fired for tardiness. R. 336–37 (also describing

11

working from home as "okay," but that customers could be difficult and rude).  LCSW Abraham reviewed skills for coping with anxiety, relaxation techniques, posed a solution to avoid tardiness, and praised plaintiff's recognition of the need to manage the relationship with her son.  *Id.*

On October 23, 2019, LCSW Abraham noted plaintiff was "not doing well at all," due to stressors associated with having three children at home and the fact that her house was "'a wreck.'" R. 338.  Plaintiff reported excessive drinking and wanting to stay in bed due to deep depression. *Id.* (noting she was on leave from working at home).  Weekly psychotherapy was arranged to assist plaintiff in coping.  *Id.*

On November 1, 2019, plaintiff told Dr. Schwartzer about increasing depression, with anxiety and insomnia, and requested assistance with applying for short-term disability from her job.  R. 430.  Plaintiff described continuing family, financial, and home-life stress and reported having nightmares, crying, irritability, anxiety (without panic attacks), isolation, headaches, and suicidal thoughts (without acting on them).  *Id.*  She denied drinking to excess, hallucinating, or experiencing paranoia, and "has not cut herself."  *Id.*  Due to plaintiff's inability to tolerate Zoloft without stomach problems, Dr. Schwartzer newly prescribed Celexa, and continued plaintiff on Wellbutrin, Seroquel, and Klonopin, directed continued psychotherapy, and had plaintiff "contract[] for safety" regarding suicide. R. 431.

On November 21, 2019, plaintiff reportedly felt "better physically than she ha[d] in a while" and told LCSW Abraham that she had "[n]o complaints," but was concerned about one of her sons.[4]  R. 339.  QVC had placed plaintiff on short-term disability/leave and she stated did not want to return to work and having to talk to people.  R. 339.

---

[4] Concerns about her son were also addressed in therapy sessions on December 11 and 18, 2019. R. 340–41.

b.      *Psychotherapy and Medication Management in 2020*

During 2020, plaintiff had approximately 12 therapy sessions with LCSW Abraham and 9

medication management sessions with Dr. Schwartzer.  R. 342–46, 433–46, 561–71, 574–92.  Dr.

Schwartzer's treatment notes before the pandemic began in March 2020 contain full mental status

exams that almost exclusively match the mostly normal findings recorded during the 2019 exams,

except as otherwise noted below.  R. 433–38.

On January 9, 2020, plaintiff told LCSW Abraham that she planned to resume work on

January 29, did not want to do so, but needed the money.  R. 342.

On January 10, 2020, plaintiff told Dr. Schwartzer that she was anxious about working

again and described switching from "part-time status to an as needed part-time status," with likely

less hours and less stress.  R. 433.  Plaintiff reported improving anxiety and depression while on

medical leave, but said that recent events, including the death of a pet, problems with her son, and

an in-law's cancer diagnosis had caused "a fair amount of generalized anxiety."  *Id.*  Since her last

appointment, plaintiff reported having only a single anxiety attack and no suicidal thoughts.  *Id.*

Dr. Schwartzer confirmed the improvement, also noting that plaintiff was neither visibly depressed

nor was her affect visibly anxious, and directed continuing with her medications, except for taking

one-half of a Seroquel tablet at night to aid with sleep.  R. 433–34.

Dr. Schwartzer next treated plaintiff on February 12, 2020.  R. 436.  Although plaintiff's

father-in-law had died, she reportedly "handled it well."  *Id.*  Similarly, plaintiff appeared to be

tolerating her return to work on reduced hours, without increasing anxiety and depression.  R. 436–

37.  Dr. Schwartzer directed plaintiff to take medications as prescribed and found her to be stable,

but with continued symptoms of anxiety and depression.  R. 437.

One week later, plaintiff tearfully reported to LCSW Abraham distress over her father-in-

13

law's death and SSA's stoppage of disability checks, with attendant loss of income. R. 343. The therapist opined that plaintiff "need[ed] to be on disability" due to anxiety and bipolar disorder. *Id.*

On March 5, 2020, plaintiff changed her work status to "variable" and told LCSW Abraham about continuing distress about the cutoff of disability benefits. R. 344. She also reported anxiety when driving with her daughter. *Id.*

On March 19, 2020, plaintiff told LCSW Abraham that she quit working at QVC because working "interfered with her disability benefits." R. 345 (noting also that she "had trouble working there anyway, because of 'other people' being there"). Plaintiff also worried about a troubled son and indicated she may have to cut back on therapy for financial reasons. *Id.*

On March 30, 2020, plaintiff reported anxiety over COVID-19 and re-applying for disability benefits and worried that a lockdown order would prevent seeing her granddaughter. R. 346.

The next day plaintiff telephonically met with Dr. Schwartzer and reported high stress and increasing depression, anxiety, and sleep problems, but no suicidal thoughts, due to losing her job and disability benefits, a $32,000.00 debt to SSA, and worry about relatives living in areas affected by COVID-19. R. 439. Dr. Schwartzer's mental status exam found plaintiff to be alert, with clear and rational speech, without psychosis or mania, and mildly anxious and sounding slightly depressed. *Id.* He increased plaintiff's Seroquel dosage. R. 439–40.

On April 30, 2020, LCSW Abraham telephonically met with plaintiff and noted she "looks and sounds well," in spite of reported "shaking inside." R. 567. Plaintiff indicated her ongoing financial challenges were somewhat mitigated by having three children working. *Id.* She also reported that, after two relatives died from the virus, she "spen[t] four days in [her] room." *Id.*

14

On May 7 and June 4, 2020, plaintiff telephonically met with Dr. Schwartzer. R. 441, 444. During these calls, plaintiff reported increasing financial and COVID-19 stress for the reasons noted above and said that she was running out of money and having trouble paying her mortgage. *Id.* Plaintiff reported feeling depressed and anxious, having problems sleeping (sometimes mitigated by Seroquel), and was socially isolated, aside from immediate family. *Id.* She reported having suicidal thoughts, but denied acting on them, and agreed to contract for safety and call emergency services, if necessary. *Id.* On May 7, 2020, Dr. Schwartzer continued plaintiff's medications and observed her to be mildly anxious and depressed. R. 441–42. On June 4, 2020, Dr. Schwartzer increased plaintiff's Seroquel dosage to help with sleep and depression and observed that she "sounded mildly to moderately depressed and . . . mildly anxious in her affect." R. 444–45.

When next seen by Dr. Schwartzer on June 23, 2020, plaintiff reported having daily suicidal thoughts and continued depression and anxiety, but denied planning to overdose and again contracted for safety. R. 541. Plaintiff reported being withdrawn, isolating in her bedroom, skipping meals, panic attacks, and improving but continuing sleep problems. *Id.* Dr. Schwartzer assessed plaintiff as depressed due to her financial situation, and his exam notes characterize her depression as mild and her affect as slightly anxious. R. 541–42.

On June 24, 2020, LCSW Abraham found plaintiff to be "more upset . . . than in the past," and observed plaintiff "breaking down" during the session, with uncertainty about how to pay monthly bills. R. 566. After encouraging and noting how plaintiff held her family together as a single parent following her husband's death seven years earlier, LCSW Abraham opined that plaintiff's anxiety, dislike, and inability to get along with others due to bipolar disorder, precluded meaningful employment. *Id.* LCSW Abraham also noted that, although plaintiff previously

15

worked for QVC, it was extremely difficult and plaintiff managed to do so only by repeatedly taking leave and time off. *Id.*

On July 3, 2020, plaintiff told Dr. Schwartzer about continuing depression and anxiety, as well as hallucinations, but claimed to be doing and sleeping better (with medication). R. 544. Noting plaintiff's improved financial situation, Dr. Schwartzer's mental status exam reported, among other things, that plaintiff sounded neither depressed nor anxious. R. 544–45.

On July 8, 2020, plaintiff made similar comments to LCSW Abraham, who described plaintiff to be "in better spirits," but somewhat nervous. R. 565. Three weeks later, however, plaintiff told LCSW Abraham that, after her daughter caught COVID-19, she cried for most of the prior week and was quarantined. R. 564 (also reporting upset due to estrangement from son and delays in resolving disability case, while bills remained to be paid).

Dr. Schwartzer telephonically met with plaintiff on August 6, 2020. R. 574. Plaintiff said she had suicidal thoughts (without acting on them), auditory hallucinations of her dead dog, granddaughter, and others, anxiety, panic attacks, low energy, and withdrawal, and reported "seeing a lot of shadows." R. 574–75. Plaintiff's financial situation apparently continued to stabilize as she now had food stamps, Medicare, mortgage forbearance, and financial help from her children. *Id.* Because plaintiff mistakenly threw out a Seroquel pill bottle when cleaning, Dr. Schwartzer wrote a new prescription and continued her other medications. *Id.* The mental status examination noted plaintiff had hallucinations, but no delusions, and that her mood did not sound depressed and her affect did not sound anxious. R. 575.

On September 1, 2020, plaintiff met telephonically with Dr. Schwartzer, who described her mood as mildly depressed and noted that her affect did not sound anxious. R. 578–79. Plaintiff reported having mainly the same symptoms and suicidal thoughts, and discussed her increasingly

oppositional relationship with her 18-year-old daughter.  R. 578.  Dr. Schwartzer recommended

taking as many as four Seroquel pills to help with sleeping.  R. 580.  Roughly a week later, plaintiff

similarly told LCSW Abraham about friction with her daughter about concern about her estranged,

older son.  R. 563.

On September 22, 2020, although plaintiff's symptoms continued, she told Dr. Schwartzer

that she was "'doing better.'"  R. 582.  Although her appetite was poor, plaintiff said that she was

"eating adequately."  *Id.*  Dr. Schwartzer found her mildly depressed, with an affect that "sounded

constricted."  R. 583.

The following day plaintiff told LCSW Abraham that she felt "very down" and said that,

if her husband were still alive, "'things would be different.'"  R. 562.  Plaintiff reported having no

suicidal thoughts and described her financial situation as stabilized, but said she had been staying

in her room and had been eating very little.  *Id.*  LCSW Abraham suggested that plaintiff either be

admitted or seek a medication change with Dr. Schwartzer, and told her to take her medications as

prescribed in the meantime.  *Id.*

On October 27, 2020, plaintiff told Dr. Schwartzer that she had been "'doing okay,'" with

only mild depression, had been sleeping and eating adequately, and denied having suicidal

thoughts.  R. 586.  She continued to frequently isolate herself and have some visual and auditory

hallucinations.  Dr. Schwartzer's mental status exam noted the same, and added that plaintiff

sounded slightly depressed and her affect sounded constricted.  R. 587.

On October 29, 2020, plaintiff told LCSW Abraham that she may be "a little better," and

discussed her sons, daughter, and granddaughter.  R. 561.  Plaintiff reported sleeping better, due

to medication changes, but said she spent most of the day in bed, but did not want to be admitted.

R. 561.  LCSW Abraham told plaintiff to notify Dr. Schwartzer, and suggested a change in

antidepressants was needed. R. 562.

On December 1, 2020, plaintiff reported feeling more depressed of late and continuing financial problems. R. 590. She had recently had a gastro-intestinal illness and worried about her daughter's mental health. *Id.* Despite having continued suicidal thoughts, plaintiff denied that a superficial cut with a table knife weeks earlier was a suicide attempt, even though she called emergency services and asked for Dr. Schwartzer. *Id.* Plaintiff said she was now less depressed with some anxiety, but was not feeling suicidal. *Id.* A mental status exam noted mild hallucinations without delusions, that plaintiff sounded drowsy at the start of the session, that she "had poverty of speech today," and that she sounded mildly depressed and her affect sounded constricted. R. 591.

### c.     *Psychotherapy and Medication Management in 2021*

During 2021, plaintiff had approximately three therapy sessions with LCSW Abraham and four medication management visits with Dr. Schwartzer. R. 558–60, 593–604.

On January 7, 2021, plaintiff reported isolating herself from everyone, thinking about suicide "'all the time,'" and wanting an in-patient admission, but not at the present time. R. 560. Plaintiff made a suicide contract with LCSW Abraham, who encouraged her to consider going to a local treatment facility. *Id.*

Plaintiff remained depressed when treating with Dr. Schwartzer on January 26, 2021, but less so than during their last encounter, and had felt suicidal only once since then. R. 593. She continued having auditory and visual hallucinations, generalized anxiety, panic attacks, a poor appetite, and isolation. R. 594. A mental status exam noted mild depression, mild hallucinations without delusions, and a constricted affect. *Id.* As plaintiff reported having fallen several times, Dr. Schwartzer told her to reduce taking Klonopin (1 mg.) to twice a day as needed for anxiety

18

and sleep and continued her other medications unchanged. R. 595.

During a February 23, 2021 telephone call with Dr. Schwartzer, plaintiff's condition remained mostly the same, except for the presence of occasional shaking in her hands and face and the absence of suicidal thoughts. R. 596–97.

Similarly, plaintiff's condition and Dr. Schwartzer's treatment plan remained much the same at her next telephonic call on March 23, 2021. R. 599–601.

During an April 20, 2021 telephone call, LCSW Abraham observed shaking in plaintiff's face and hands, who reported difficulty in venturing outside the house. R. 558 (noting the need to get in and out promptly at grocery and big box stores).

On May 18, 2021, plaintiff telephonically treated with Dr. Schwartzer and her condition mostly remained the same as previously reported. R. 602. Plaintiff again reported having superficially cut herself a couple of times in the last month, but denied this activity was a suicide attempt. R. 602. To assist with sleep, plaintiff took two Klonopin at bedtime. *Id.* Although frequently isolated, plaintiff had tried to get out of her bedroom more often. R. 602–03. Plaintiff denied having auditory hallucinations, but reported continuing to see shadows. R. 603. Plaintiff continued to have difficulty leaving the house, due to occasional panic attacks, and described her appetite as poor. *Id.*

On June 30, 2021, LCSW Abraham prepared a written report on plaintiff's mental functional capacities. R. 605–06. She identified plaintiff's impairments as bipolar disorder, dysthymia, and severe anxiety. R. 605. She listed plaintiff's symptoms as including isolating herself; inability to be associated with others; weekly panic attacks; a lack of interest in activities or venturing outside the home; suicidal thoughts; and the absence of memory, focus, and concentration. *Id.* LCSW Abraham opined that "no cure" exists for plaintiff's impairments,

19

although they slightly improved with medication.  *Id.*

LCSW Abraham assessed plaintiff's mental functional capacities as follows:  (1) mostly extreme limitations in understanding and remembering; (2) mostly extreme limitations in sustaining concentration and persistence; (3) only extreme limitations in interacting socially; and (4) mostly extreme limitations in adaptation.  R. 605–06.  In conclusion, LCSW Abraham noted that plaintiff's "symptoms are so severe and extreme that any productive work is unrealistic and not appropriate."  R. 606.

### 4.  *Opinions of State Agency Experts*

On May 28, 2020, Daniel Walter, Psy.D., opined on initial review that plaintiff met neither listing 12.04 nor 12.06.  R. 57.  With respect to the "B" criteria, Dr. Walter found plaintiff with moderate limitations in interacting with others[5] and with concentrating, persisting, and maintaining pace[6], but with no limitations in adaptation and in understanding, remembering, or applying information.  R. 57.  Dr. Walter also found that evidence failed to establish the presence of "C" criteria.  R. 57.

On October 28, 2020, Stephen Saxby, Ph.D., reached similar opinions, but found greater limitations in assessing the B criteria.  Dr. Saxby found the evidence insufficient to satisfy listings

---

[5] With respect to concentration and persistence, Dr. Walter found plaintiff moderately limited in her abilities to perform detailed instructions, to concentrate and keep attention for extended time periods, and to complete normal workdays and weeks without symptoms and maintain pace without an unreasonable number of breaks.  R. 59.  In other respects, Dr. Walter found plaintiff's concentration and persistence abilities not significantly limited.  R. 59.

[6] With respect to social interactions, Dr. Walter found plaintiff moderately limited in interacting appropriately with the public, in accepting instructions and appropriately responding to supervisory criticism, in getting along with co-workers without causing distractions or engaging in extreme behavior, and in behaving socially and in meeting basic requirements of cleanliness and neatness.  R. 59.  Dr. Walter found no significant limitations in asking questions and seeking help.  R. 59.

12.04 or 12.06, and to establish presence of the C criteria.  R. 68–69.  Further, in addition to the moderate limitations assessed by Dr. Walter under the B criteria, Dr. Saxby also found plaintiff to be moderately limited in understanding, remembering, and applying information[7], and in adapting and managing herself.[8]  R. 69.

### III.  THE ALJ'S DECISION

To evaluate plaintiff's claim of disability,[9] the ALJ followed the sequential five-step analysis set forth in the SSA's regulations.  *See* 20 C.F.R. § 404.1520(a).  Specifically, the ALJ considered whether plaintiff:  (1) was engaged in substantial gainful activity; (2) had a severe impairment; (3) had an impairment that meets or medically equals a condition within the SSA's listing of official impairments; (4) had an impairment that prevents her from performing any past relevant work in light of her residual functional capacity; and (5) had an impairment that prevents her from engaging in any substantial gainful employment.  R. 17–30.

---

[7] Dr. Saxby based this limitation upon plaintiff's moderate limitation in understanding and remembering detailed instructions and his assessment that she could only remember "very familiar locations and very well learned and familiar work-like procedures."  R. 71.

[8] Dr. Saxby opined that plaintiff would need help adapting to change unless it occurred infrequently and was gradually implemented.  R. 72.

[9] To qualify for disability insurance benefits, an individual must meet the insured status requirements of the Social Security Act, be under age 65, file an application, and be under a "disability" as defined in the Act.  "Disability" is defined, for the purpose of obtaining disability benefits, "as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); *accord* 42 U.S.C. §§ 416(i)(1)(A), 423(d)(1)(A).  To meet this definition, the claimant must have a "severe impairment" making it impossible to do previous work or any other substantial gainful activity that exists in the national economy.  20 C.F.R. § 404.1505(a).

First, the ALJ determined that plaintiff met the insured requirements[10] of the Social Security Act through December 31, 2024, and had not engaged in substantial gainful activity from January 1, 2019, her alleged onset date of disability, through July 30, 2021. R. 17.

At steps two and three, the ALJ found that plaintiff's bipolar disorder, generalized anxiety disorder, depressive disorder, and personality disorder constituted severe impairments. R. 17–18. The ALJ classified plaintiff's other impairments as non-severe. R. 18–19. The ALJ further determined that plaintiff's severe impairments, either singly or in combination, failed to meet or medically equal the severity of one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, as required for a finding of disability at step three. R. 19–21.

The ALJ next found that plaintiff possessed the residual functional capacity ("RFC") to perform a full range of work at all exertional levels.[11] R. 21–22. The ALJ also specified the following non-exertional limitations:

> the claimant can do simple routine tasks, but no complex tasks, in low stress environment defined as occasional decision-making and occasional changes in work setting. She can have no fast pace production work, such as conveyor belt/quota based work, and she is capable of occasional interaction with supervisors and coworkers, but no team type setting work, and no interaction with the public.

*Id.*

At step four, the ALJ decided that plaintiff had no relevant past work, because her earnings from QVC were insufficient to qualify as "substantial gainful activity" in either 2019 or 2020. R. 28, 180. Having reviewed the DOT and the VE's testimony, at step five the AC concluded that

---

[10] In order to qualify for DIB, an individual must also establish a disability that commenced on or before the last day in which that individual met the insured status requirements of the Social Security Act. *See* 42 U.S.C. § 423(a), (c); 20 C.F.R. § 404.131(b).

[11] In doing so, the ALJ considered the potential impact of plaintiff's obesity, a non-severe impairment, on her ability to walk and on her other body symptoms, but found a lack of evidence about impacts on plaintiff's pulmonary, musculoskeletal, endocrine, or cardiac function. R. 18–19.

plaintiff could perform existing jobs in the national economy, such as by working as an inserter, a semiconductor bonder, and a marker/ticketer. R. 29–30.

Accordingly, the ALJ concluded plaintiff was not under a disability from January 1, 2019 through July 30, 2021, and was ineligible for disability benefits. R. 30.

## IV.   STANDARD OF REVIEW

In reviewing a Social Security disability decision, the Court is limited to determining whether the Commissioner applied the proper legal standard in evaluating the evidence and whether substantial evidence in the record supports the decision to deny benefits. 42 U.S.C. § 405(g); *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla of evidence[,] but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (noting the substantial evidence standard is "more than a mere scintilla," but "is not high").

When reviewing for substantial evidence, the Court does not re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589 (citing *Hays*, 907 F.2d at 1456). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." *Id.* (quoting *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)). The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed, unless the decision was reached by

23

means of an improper standard or misapplication of the law. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987) (citing *Myers v. Califano*, 611 F.2d 980, 982 (4th Cir. 1980)). Thus, reversing the denial of benefits is appropriate only if either (A) the record is devoid of substantial evidence supporting the ALJ's determination, or (B) the ALJ made an error of law. *Coffman,* 829 F.2d at 517.

## V.   ANALYSIS

### A.   *The ALJ committed no legal error and substantial evidence supports the conclusion that LCSW Abraham's opinions were unpersuasive.*

Plaintiff seeks a remand arguing that the ALJ improperly evaluated LCSW Abraham's opinions about plaintiff's extreme mental functional limitations. Pl's Mem. 9–12. Plaintiff argues that the ALJ analyzed the supportability and consistency of LCSW Abraham's opinions in conclusory fashion, violating SSA's regulations requiring an explanation about such factors. *Id.* at 11–12; *see* 20 C.F.R. § 404.1520c(b)(2). Plaintiff also argues that the ALJ discredited LCSW Abraham's opinions for invalid and illogical reasons that equated plaintiff's participation in mental health exams with her ability to work and interact with others at work. *Id.* at 10–11.

The Commissioner contends that substantial evidence supports, and that the ALJ correctly explained why she was not persuaded by LCSW Abraham's opinions. Mem. of Law in Supp. Of Def.'s Cross Mot. for Summ. J. and in Opp. to Pl.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 16, at 22–24. Comparison of the objective evidence obtained in plaintiff's generally favorable mental status exams with the severe and extreme limitations identified by LCSW Abraham, the Commissioner argues, gave the ALJ ample reasons for finding the latter to be "grossly overestimate[d]." *Id.* at 23 (citing R. 27). This determination, the Commissioner asserts, was buttressed by the ALJ's review of the objective evidence in LCSW Abraham treatment records, as well as by the ALJ's review of inconsistent evidence in the treating records of other providers. *Id.*

24

at 23–24.  Finally, the Commissioner argues that the plaintiff misinterprets the ALJ's reasoning for finding LCSW Abraham's opinions to be unpersuasive.  *Id.* at 24–25.  According to the Commissioner, the ALJ discounted the disputed opinions not because plaintiff actively participated in treatment, but rather because examination results and findings failed to support the severe limitations identified by LCSW Abraham and because such opinions touched upon matters entrusted by law to the ALJ.  *Id.*

### 1. The SSA's methodology for considering medical opinions for claims filed on or after March 27, 2017, applies to this case.

The SSA revised its evidence rules for claims filed on or after March 27, 2017.  82 Fed. Reg. 5844, at 5853–55 (Jan. 18, 2017); *see also* 82 Fed. Reg. 15132 (Mar. 27, 2017) (correcting technical errors in final rule).  Plaintiff filed her application for disability benefits in 2020, and the new rules apply to her case.

The revised regulations dispensed with the treating physician rule.  *See* 20 C.F.R. § 404.1527(c)(2); *see also Brown v. Comm'r Soc. Sec. Admin.*, 873 F.3d 251, 255–56 (4th Cir. 2017).  The new rules, contained in 20 C.F.R. § 404.1520c, direct an ALJ to "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinions or prior administrative medical findings."[12]  20 C.F.R. § 404.1520c(a).  Under the new rules, an ALJ must consider and explain the persuasiveness of each medical opinion in the record.[13]  20 C.F.R. §

---

[12] Opinions of state agency consultants, identified as "prior administrative medical findings," are assessed using the same rubric.  20 C.F.R. § 404.1520c(a); *see* 82 Fed. Reg. 5844, at 5853 (highlighting the "eliminat[ion of] confusion about a hierarchy of medical sources" and greater focus upon the persuasiveness of any given opinion); 20 C.F.R. § 404.1513(a)(5) (defining "prior administrative medical finding[s]" as those rendered by federal or state agency consultants).

[13] A "medical opinion" is a statement from a medical source about a claimant's limitations and ability to perform physical, mental, and other work demands, and to adapt to a workplace environment, in spite of her impairments.  20 C.F.R. § 404.1513(a)(2)(i)–(iv).

404.1520c(b); *see* 82 Fed. Reg. 5844, at 5854 (noting that the new rules "focus more on the content of medical opinions and less on weighing treating relationships against each other").

An ALJ now reviews medical opinions and findings based upon: (1) supportability, or the relevance and strength of explanations for the opinion; (2) consistency, or the similarity with other opinions; (3) relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the relationship, and extent of the relationship; (4) specialization, relating to the training of the source; and (5) other factors, including but not limited to the source's familiarity with other medical evidence and the SSA's policies and requirements. 20 C.F.R. § 404.1520c(a), (c).

In assessing persuasiveness, however, an ALJ's chief task is to decide and explain whether an opinion or finding is supported by and consistent with the record. *Id.* § 404.1520c(b)(2), (c)(1)–(2); *see* 82 Fed. Reg. 5844, at 5853 (describing these as the "two most important factors"). Explanation about the remaining factors is only required when an ALJ concludes that two or more medical opinions are equally supported by and consistent with the record. 20 C.F.R. § 404.1520c(b)(3). The rule also clarifies that evidence should be handled on a provider-by-provider basis, not an opinion-by-opinion basis, negating the need for individual treatment of every medical opinion in the record. 20 C.F.R. § 404.1520c(b)(1). This framework guides the Court's review below.

2.  ***The ALJ committed no error in evaluating LCSW Abraham's opinions.***

ALJ Wolfe's treatment of LCSW Abraham's opinions satisfied the rules described above. To begin, the ALJ correctly identified her task to review medical opinions for persuasiveness under the new rules, rather than the treating physician rule, and recognized the primacy of factors of supportability and consistency. R. 26. The ALJ next recited LCSW Abraham's opinions,

26

including her assessment of plaintiff's symptoms as "so severe and extreme" that they preclude "any productive work."  R. 27.  Based on the ALJ's review of the record, as discussed further below, the ALJ found LCSW Abraham's opinions about plaintiff's extreme limitations to be "grossly overestimate[d]."  *Id.*  The ALJ also found such opinions to be at odds with the numerous mental status examinations of plaintiff during the lengthy course of treatment following the alleged onset of disability.  *Id.*  The ALJ also highlighted her review of statements contained in plaintiff's psychotherapy treatment records provided by LCSW Abraham, as well as in the records of other providers, and found plaintiff's statements about her condition and inability to work wanting and at odds with such records.  R. 27–28.  Based upon the foregoing, the ALJ deemed LCSW Abraham's opinions to be unpersuasive.

The ALJ recognized that, in the absence of any supporting and explanatory rationale, LCSW Abraham's opinions mostly rested upon her acceptance of plaintiff's subjective allegations and statements during psychotherapy.  Unlike LCSW Abraham, the ALJ, who had the benefit of reviewing the entire record, including plaintiff's treatment with her primary care provider and Dr. Schwartzer, found the same to be "not supportive of the intensity or persistence of [plaintiff's] subjective allegations" and "not supportive of more restrictive findings than adopted" by the ALJ. R. 28.  The ALJ also explained that she found plaintiff's impairment and limitations to be more accurately and reliably captured by the results of mental status examinations, plaintiff's activities of daily living, and other detailed observations of her medical providers.  *Id.*

For example, the ALJ noted that plaintiff drove herself to her own medical appointments, which as noted above occurred every two to four weeks from roughly January 2019 through June 2021. R. 22–23.  The ALJ also observed that plaintiff's treatment was conservative and consisted of medication and psychotherapy, without psychiatric hospitalizations or in-patient treatment,

which plaintiff had declined. R. 22 (noting inconsistency between medical record and plaintiff's statements), 23, 26. In discussing this inconsistency, the ALJ took note of findings in the medical record describing plaintiff as "stable in the community, with her mental illness controlled by medication." R. 24; *see also* R. 25; *see, e.g.*, R. 600–01 (noting the same, as well as plaintiff's report of continued symptoms and need for continued treatment); *cf. Barbare v. Saul*, 816 F. App'x 828, 834 (4th Cir. 2020) (finding no error in ALJ's assessment of treating physician opinion regarding a severe impairment and noting that "[i]t goes without saying that '[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling'" (quoting *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986))).

The ALJ also identified activities of daily living at odds with the extreme limitations proffered by LCSW Abraham. These included engaging in personal care, caring for her children, babysitting a grandchild, cooking, shopping at stores and online, managing finances, watching TV, regularly communicating with her mother, attending appointments, and taking vacations to beach towns. R. 26. Although acknowledging that limitations resulted from plaintiff's impairments, the ALJ (unlike LCSW Abraham) decided that such activities supported a finding that plaintiff could regularly work, subject to a lesser set of limitations.[14]

The ALJ also observed that the limitations identified by LCSW Abraham conflicted with mostly favorable, objective findings from plaintiff's numerous, mental status examinations. R. 20, 25–28. For example, the ALJ noted that, during multiple 2019 visits to her primary care provider, plaintiff's "mood and affect were appropriate[,] . . . her memory was intact[,] her judgment and

---

[14] In assessing plaintiff to be only moderately limited in mental functioning in the four pertinent domains, R. 20–28, the ALJ decided that she possessed a "fair" ability to function therein "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(F)(2)(c).

28

insight were appropriate[,] she was well groomed[,] and in no acute distress." R. 26. Similarly, the ALJ described Dr. Schwartzer's mental status exams from January 2018 through March 2021 as revealing plaintiff to be alert, fully oriented, with well-organized thought, without loose associations or flight of ideas, with relevant, coherent, and goal-directed speech, with grossly intact recent and remote memory (notwithstanding plaintiff's contrary reports), with intact cognitive functioning, and with fair insight and judgment. R. 24. The ALJ also noted that Dr. Schwartzer's records reflected that plaintiff actively engaged with the provider, asked questions, and participated in treatment decisions and planning. R. 20. The ALJ also recounted similar, favorable mental status examination findings from April 2018 through April 2021 made by LCSW Abraham, R. 25, which the latter failed to explain or reconcile with the extreme limitations posited on June 30, 2021, R. 605–06.

While recognizing that plaintiff had severe impairments and that treatment records showed her mood and affect varying from mild to moderate on a monthly basis, the ALJ also observed that plaintiff's mental status exams were otherwise "generally stable," without other negative findings. R. 23; *see also* R. 20, 24–26. The ALJ also found these numerous and regular objective findings were at odds with the extreme limitations opined by LCSW Abraham. R. 27. These differences, along with plaintiff's daily activities and relatively conservative treatment, support the ALJ's conclusion that LCSW Abraham "grossly overestimate[d]" plaintiff's limitations. R. 27.

The ALJ also explained why she found the administrative findings of the state agency providers to be more, but not entirely, persuasive. R. 27–28. Again noting the mental status exams, the ALJ agreed with Dr. Walter's opinion that plaintiff could engage in simple tasks and work. R. 27. The ALJ also found, however, that plaintiff's bipolar disorder and medication side effects supported moderate limitations relative to understanding, memory, and adaptation beyond

those posed by Dr. Walter. *Id.* Similarly, the ALJ considered Dr. Saxby's opinions and agreed that plaintiff remained able to perform familiar and routine work procedures, subject to limited interaction with others and limited changes at work, based partly upon the nature and extent of plaintiff's interactions with Dr. Schwartzer during treatment sessions, as well as her own statements about problems dealing with others. R. 28.

Based upon the nature and scope of plaintiff's treatment, her activities, her record of treatment and the objective findings revealed therein, and the administrative findings of the state agency experts, the ALJ rejected LCSW Abraham's apparent, wholesale and unexplained reliance upon plaintiff's statements. Accordingly, substantial evidence supports her conclusion that LCSW Abraham overstated plaintiff's limitations by a wide margin. Although the ALJ did not explicitly classify the information reviewed as relating to supportability and consistency or review all the information in one place, her analysis of the persuasiveness of LCSW Abraham's opinions met the requirements of 20 C.F.R. § 404.1520c. This is so because an ALJ decision supported by substantial evidence and complying with the law need not use any "particular language or adhere to a particular format." *Todd A. v. Kijakazi*, No. 3:20cv594, 2021 WL 5348668, at *4 (E.D. Va. Nov. 16, 2021); *see also Gassaway v. Colvin*, No. 1:12cv982, 2013 WL 2389894, at *6 (E.D. Va. May 28, 2013). Similarly, an ALJ need not repeat pertinent findings multiple times in her ruling for the purpose of supporting individual conclusions. *See Smith v. Astrue*, 457 F. App'x 326, 328 (4th Cir. 2011) (reviewing "the ALJ's decision as a whole" in assessing for substantial evidence); *McCartney v. Apfel*, 28 F. App'x 277, 279 (4th Cir. 2002) (noting "that the ALJ need only review medical evidence once in his decision"); *Kiernan v. Astrue*, No. 3:12cv459, 2013 WL 2323125, at *5 (E.D. Va. May 28, 2013) (observing that an "ALJ [who] analyzes a claimant's medical evidence in one part of his decision . . . [need not] rehash that discussion" in other parts of the analysis).

The ALJ also properly rejected LCSW Abraham's statements about plaintiff being disabled, unable to work, and that performing "productive work is unrealistic and not appropriate for this suffering patient." R. 606; *see* R. 27, 343, 566. Such determinations are entrusted to the Commissioner. *See* 20 C.F.R. § 404.1520b(c)(3) (noting that statements about whether a claimant is disabled and unable to work are "issues reserved to the Commissioner"); *see also* 20 C.F.R. § 404.1546(c) (noting an ALJ's responsibility for assessing a claimant's RFC).[15]

Finally, the Court also rejects plaintiff's argument that the ALJ discounted LCSW Abraham's opinions for improper reasons. Plaintiff's contention that the ALJ rejected the social worker's opinions simply because plaintiff "participat[ed] and cooperat[ed] in . . . examination[s]" during treatment is unsupported. *See* Pl.'s Mem. 10. Instead, as noted by the Commissioner, and as discussed above, the ALJ quite properly discounted those opinions because they failed to reconcile with LCSW Abraham's own mental status examinations, and were also mostly at odds with similar examinations by Dr. Schwartzer and plaintiff's primary care provider. *See* Def.'s Mem. 24. Plaintiff's related complaint that the ALJ considered plaintiff's mental functional capacities during mental health treatment as having a bearing on her mental functional capacity for work, Pl.'s Mem. 11, also misses the mark. When, as here, plaintiff was mostly not working, the ALJ quite properly looked to other measures of her mental functional capacities, including her mental status examinations and her interactions with medical and mental health treatment providers. *See, e.g.*, 20 C.F.R. Pt. 404, Subpt. P, App.1 § 12.00(F)(3)(b) (noting that the mental functioning criteria apply to daily life activities, as well to work, and the information about

---

[15] The RFC determination is an administrative assessment based upon the record as a whole, distinct from any provider's personal assessment of a claimant's limitations. *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a)(3); *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (citations omitted).

mental functioning on a daily basis may help assess a claimant's ability to function in a work setting). Although not dispositive, such examinations and interactions provide some measure of plaintiff's understanding, memory, ability to follow instructions, interact with others and respond to questions, and adapt to changes in life and her environment.[16] R. 20–21.

**B.    *Substantial evidence supports the ALJ's conclusion that plaintiff's mental disorders have not resulted in marginal adjustment under the C criteria.***

Plaintiff also argues that the ALJ erred in analyzing the listings for mental health disorders at step three. Pl.'s Mem. 13–16. Plaintiff argues that she satisfied the C criteria needed to meet listings 12.04 (depressive and bipolar disorders) and 12.06 (anxiety disorders). *Id.* at 14–15. Plaintiff's contends that the ALJ's bald, contrary conclusion, which contains no discussion of the evidence, warrants a remand. *Id.* at 15–16.

The Commissioner contends that the ALJ found that plaintiff failed to show evidence of marginal adjustment, as required by the C criteria, and that this finding is supported by the findings of the state agency experts, plaintiff's varied activities, and by plaintiff's work at QVC and the reasons she gave for quitting that work. Def.'s Mem. 21–22.

At step three, the ALJ assessed whether the plaintiff met the listings for three mental disorders (listings 12.04, 12.06, and 12.08), the third of which is not at issue in this appeal. R. 19–21. Listings 12.04 and 12.06 require satisfying either the A and B criteria or the A and C criteria specified therein. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04, 12.06. The A criteria for those two listings differ, but both require medical documentation of a minimum number of certain

---

[16] Moreover, contrary to plaintiff's suggestion, the dozens of mental status examinations in this case wholly separate it from the finding in *Phipps v. Comm'r, Soc. Sec.*, No. CIV. WDQ-14-0684, 2014 WL 5501925, at *2 (D. Md. Oct. 30, 2014), that "a single treatment note [about] . . . recent improvement in his back pain . . . [and] upcoming knee surgery" were insufficient to establish a claimant's ability to stand and walk for light work.

identified symptoms. *Id.* at §§ 12.04(A), 12.06(A). Although the ALJ identified the pertinent A criteria symptoms, she did not analyze them and arguably assumed they were met. R. 19. Instead, the ALJ analyzed and concluded that, as plaintiff's impairments satisfied neither the B or the C criteria, they failed to meet or medically equal listings 12.04 and 12.06 at step three. R. 20–21.

Plaintiff challenges the ALJ's analysis of the C criteria for listings 12.04 and 12.06, which both require establishing the following predicates:

> C. Your mental disorder in this listing category is "serious and persistent;" that is, you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
>> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder (see 12.00G2b); and
>>
>> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life (see 12.00G2c).

20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04(C), 12.06(C). Stated another way, to satisfy the C criteria there must be both a documented history of the existence of such a disorder for at least two years and the evidence must also establish the presence of both the C1 and C2 factors. *Id.* at 12.00(G) (describing the evidence needed to establish a "serious and persistent" mental disorder).

The ALJ stated that "[t]here is no medically documented history of a chronic affective disorder of at least two years duration and repeated episodes of decompensation." R. 21. At the first step, however, as plaintiff correctly argues the evidence requires only that a disorder be documented over at least a two-year period. 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.04(C), 12.06(C). Plaintiff's course of treatment with, and diagnoses from Dr. Schwartzer and LCSW Abraham, from at least April 2019 through May 2021 satisfy this requirement and the Commissioner does not argue otherwise.

33

With respect to the C1 and C2 factors, the ALJ concluded that the record failed to reveal "a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands would cause decompensation." R. 21. The ALJ also determined that the record failed to include "a history of being unable to function outside a highly supportive living arrangement" or one of "anxiety resulting in complete inability to function independently outside the area of one's home." *Id.* To buttress these findings, the ALJ also pointed to the state agency experts' assessments that the evidence failed to establish the presence of the C criteria. *Id.*

The ALJ findings appear to overstate the requirements of criterion C1. Although evidence of an ability to function outside of a highly supportive living arrangement would appear to constitute some evidence relative to that criterion, such evidence does not appear to preclude a finding that this criterion was satisfied. As noted by plaintiff, Pl.'s Mem. 14, her medication management treatment, including the prescriptions regularly written by Dr. Schwartzer, along with her regular psychotherapy sessions with LCSW Abraham, appear to satisfy the requirement for ongoing treatment and therapy that reduces the symptoms and signs of her mental disorders. *See* 20 C.F.R. Part 404, Subpt. P, App. 1, §§ 12.00(G)(2)(b), 12.04(C)(1), 12.06(C)(1).

This leaves the question of whether the evidence supports a finding of "marginal adjustment" under criterion C2. SSA regulations elaborate that this requires evidence that, in spite of reduced symptoms and signs due to treatment, a claimant's adjustment remains marginal, her ability to adapt to daily living is "fragile," and that she is at most only minimally able to respond to environmental changes or other demands outside the scope of her normal daily life. *Id.* at § 12.00(G)(2)(c). For example, marginal adjustment exists when, in response to the foregoing changes and demands, a claimant's symptoms are exacerbated, her function deteriorates, and she

is unable to function outside the home without substantial psychosocial support.  *Id.* (noting that such circumstance may require "significant change[s] in medication or other treatment").

Here, the ALJ's determination that the evidence fails to establish "marginal adjustment" is supported by substantial evidence, for many of the same reasons discussed above.  First, in discussing the B criteria and plaintiff's RFC, the ALJ concluded that plaintiff's mental functioning in each of the pertinent domains was only moderately limited; meaning that she retained a "fair" ability to function therein "independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(F)(2)(c); *see* R. 20–21, 27.  Second, the ALJ rejected LCSW Abraham's opinions positing the existence of more severe limitations, finding that the record evidence failed to support the plaintiff's allegations (as reflected in psychotherapy notes). R. 23, 28.  Third, in rejecting plaintiff's claims of work-preclusive limitations, the ALJ found more compelling, among other things, the longitudinal medical record and accompanying mental status exams, plaintiff's activities of daily living, and evidence of her other activities and abilities.  R. 28.  Fourth, the ALJ noted the plaintiff's conservative and consistent course of treatment, which enabled her to remain stable and in the community (and to work for some period of time).  R. 23–25.  Such evidence, as further detailed above, along with the opinions of the state agency experts, constitutes substantial evidence supporting the ALJ's ultimate conclusion that C criteria were not met.

## VI.    **RECOMMENDATION**

For the foregoing reasons, this Court recommends that plaintiff's motion for summary judgment (ECF No. 13) be **DENIED**, and the Commissioner's motion for summary judgment (ECF No. 15) be **GRANTED**.

## VII.    **REVIEW PROCEDURE**

By copy of this report and recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date this report is forwarded to the objecting party by Notice of Electronic Filing or mail, *see* 28 U.S.C. § 636(b)(1), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. Rule 6(d) of the Federal Rules of Civil Procedure permits an extra three (3) days, if service occurs by mail. A party may respond to any other party's objections within fourteen (14) days after being served with a copy thereof. *See* Fed. R. Civ. P. 72(b)(2) (also computed pursuant to Rule 6(a) and (d) of the Federal Rules of Civil Procedure).

2.      A district judge shall make a *de novo* determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in a waiver of appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

                                                    /s/
                                          _____
                                                    Robert J. Krask
                                          UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
November 1, 2022

37